IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------x
1ST AMENDMENT PRAETORIAN            :
                                    :
        Plaintiff,                  :
                                    :
v.                                  :    Case No. _____
                                    :
                                    :    COMPLAINT
THE NEW YORK TIMES COMPANY          :
                                    :
-and-                               :
                                    :
ALAN FEUER                          :
                                    :
        Defendants.                 :
-------------------------------------------------------x
```

Plaintiff, 1ST Amendment Praetorian ("Plaintiff" or "1AP"), by counsel, pursuant to Rule 3 of the Federal Rules of Civil Procedure (the "Rules"), files the following Complaint against defendants, The New York Times Company ("NYT") and Alan Feuer ("Feuer"), jointly and severally.

Plaintiff seeks (a) compensatory damages and punitive damages in the sum of **$100,000,000.00**, (b) prejudgment interest on the principal sum awarded by the Jury from January 6, 2021 to the date Judgment is entered pursuant to New York Civil Practice Law and Rules ("CPLR") § 5001, and (c) costs incurred – arising out of the Defendants' defamation and defamation by implication.

## I.  **INTRODUCTION**

1.      Between January 3, 2022 and July 11, 2022, Defendants published a series of articles (which were republished to NYT's 54,700,000+ social media followers) that falsely imply 1AP played a role in the January 6, 2021 attack on the United States

1

Capitol.  The articles promote a narrative[1] that domestic violent extremists were involved in the planning and coordination of the insurrection and seditious acts that unfolded on January 6.  The articles paint a picture of 1AP that is plainly untrue and defamatory.

2.      In this case, 1AP seeks presumed damages, actual damages and punitive damages as a result of Defendants' defamation and defamation by implication.

## II.  PARTIES

3.      1AP is a Delaware corporation with a principal place of business in Dallas, Texas.

4.      NYT is a New York corporation headquartered in New York.  NYT publishes *The New York Times* newspaper and www.nytimes.com.  NYT is a well-known "Democratic Party broadsheet".  *Tah v. Global Witness Publishing, Inc.*, 2021 WL 1045205, at * 17 (D.C. Cir. 2021) (Silberman, J., dissenting).  In addition to its print and digital products, NYT targets advertisers, subscribers and viewers via social media.  NYT has over 54,700,000 followers on Twitter alone. [https://twitter.com/nytimes].

5.      Feuer is a citizen of New York.  He joined NYT in 1999.  The articles at issue in this action (described below) conspicuously advise readers that "**Alan Feuer covers extremism and political violence**."  This biographical language conveys to readers that Feuer is a specialist in extremism and political violence, which, in the overall context of the articles at issue, endorses the defamatory implication that 1AP is an extremist group and that it participated in the violence of January 6, 2021.

---

[1]      Upon information and belief, in pushing the "domestic violent extremism" (DVE) narrative, NYT and Feuer were acting upon instructions and at the direction of one or more government agencies, including the Federal Bureau Investigation ("FBI").

### III.  JURISDICTION AND VENUE

6.      The United States District Court for the Southern District of New York has subject matter jurisdiction over this action pursuant to Title 28 U.S.C. § 1332 (Diversity).  The parties are citizens of different States.  There is complete diversity.  The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      NYT and Feuer are at home in New York and subject to the Court's general personal jurisdiction.

8.      Venue is proper in this Court pursuant to Title 18 U.S.C. §§ 1391(b)(1) and (b)(2).  NYT and Feuer reside and are subject to personal jurisdiction in New York.  A substantial part of the events or omissions giving rise to the claims in this case occurred in New York.

### IV.  STATEMENT OF MATERIAL FACTS

9.      Robert Patrick Lewis ("Lewis") is a decorated United States Army Green Beret, who received a Bronze Star and Purple Heart in the service of his Country.  He possessed a TS-SCI security clearance and received an Honorable Discharge.  In 2020, Lewis founded 1AP to provide pro bono security and protective services at grassroots events.  Lewis created 1AP to ensure that every American can freely associate, freely gather and freely speak on matters of public concern to them without threat or fear of intimidation, retribution, bodily harm or death. [https://1apraetorian.com/].

10.     January 6, 2021 was one of the most dangerous days in the modern history of our republic.

11.     On January 6, 2021, 1AP provided security detail for members of the press, including a Washington D.C. ABC affiliate.

12.    Neither 1AP, Lewis, nor any of 1AP's security professionals engaged in violence or played any part in the attack on the United States Capitol on January 6, 2021. Prior to publication of the articles at issue in this case, NYT and Feuer knew that 1AP had been thoroughly investigated by the FBI, and cleared of any wrongdoing. NYT and Feuer also knew that no charges had ever been brought against 1AP or any of its members by any law enforcement agency. NYT and Feuer knew the truth, but chose to publish egregious lies.

**A.    The J3 Article**

13.    On January 3, 2022, NYT published an online article written by Feuer entitled, "***Another Far-Right Group Is Scrutinized About Its Efforts to Aid Trump***" [https://www.nytimes.com/2022/01/03/us/politics/first-amendment-praetorian-trump-jan-6.html (the "J3 Article")]. On January 4, 2022, a version of the J3 Article appeared in print, on Section A, Page 1 of the New York edition of *New York Times* with the headline: "Jan. 6 Inquiry Turns Its Focus To New Group".

14.    The J3 Article was republished millions of times by third-parties, who clearly understood the Article to convey a defamatory meaning, *see, e.g.*:

> https://twitter.com/SethAbramson/status/1480578218881171468;
> https://twitter.com/PiperK/status/1478212384774787073;
> https://twitter.com/jilevin/status/1478156996008370179;
> https://twitter.com/AramRoston/status/1478223154539601920;
> https://twitter.com/morgfair/status/1478157023745249281;
> https://twitter.com/karolcummins/status/1478418573915992064.

15.    The J/3 Article juxtaposes the following series of facts:

a.    "[d]ays after a pro-Trump mob stormed the Capitol on Jan. 6 last year, federal law enforcement officials pursued two high-profile extremist groups: the far-right nationalist Proud Boys and the Oath Keepers militia. Members of both organizations

were quickly arrested on attention-grabbing charges, accused of plotting to interfere with the certification of the 2020 vote count";

      b.      "[n]ow congressional investigators are examining the role of another right-wing paramilitary group that was involved in a less publicly visible yet still expansive effort to keep President Donald J. Trump in power:  the 1st Amendment Praetorian";

      c.      "1AP … spent much of the postelection period working in the shadows with pro-Trump lawyers, activists, business executives and military veterans to undermine public confidence in the election and to bolster Mr. Trump's hopes of remaining in the White House";

      d.      "the group had men on the ground outside the building on Jan. 6 and others at the Willard Hotel, near some of Mr. Trump's chief allies.  And in the days leading up to the assault, 1AP's Twitter account posted messages suggesting that the group knew violence was imminent";

      e.      on the day of the Capitol attack, "at least one of Mr. Lewis's lieutenants, Geoffrey Flohr, a former Michigan police officer, was outside the building walking the grounds and talking on his cellphone just before the riot erupted";

      f.      another member of "1AP posted on Twitter that afternoon, claiming he was in an 'overwatch position' in Arlington County, Va.,[2] where prosecutors say the Oath Keepers had placed at a hotel an armed 'quick reaction force' that was prepared to move into Washington if needed"; and

---

[2]      Members of 1AP were staying at a Holiday Inn in Arlington (7.5 miles away from the Capital) because of the favorable room rates.  There was no line of sight from the Holiday Inn to the Capitol.  1AP had no knowledge that the Oath Keepers were staying at a hotel and/or that the Oath Keepers had "placed an armed 'quick reaction force'" at any hotel.  NYT and Feuer implied a connection between 1AP and the activities of the Oath Keepers that was knowingly false and defamatory.

g.      "as for Mr. Lewis [President of 1AP], '[t]oday is the day the true battles begin,' he wrote on Twitter just as the Capitol was breached."

16.     The defamatory gist of the J/3 Article is that 1AP is a right-wing paramilitary group, like high-profile extremist and far-right nationalist Proud Boys and Oath Keepers militia, that was involved in President Donald Trump's plot to interfere with the certification of the 2020 vote count and the attack on the Capitol.  The ordinary meaning of the words used and the context in which they were employed in the J3 Article makes them susceptible to a defamatory implication.

**B.      The 3/29 Article**

17.     On March 29, 2022, NYT published an online article written by Feuer entitled, "***New Focus on How a Trump Tweet Incited Far-Right Groups Ahead of Jan. 6***" [https://www.nytimes.com/2022/03/29/us/politics/trump-tweet-jan-6.html (the "3/29 Article")].  Feuer and other NYT employees tweeted out the 3/29 Article, stating or implying to their Twitter followers and readers that 1AP "stormed the Capitol" on January 6, 2021 [*See, e.g.,* https://twitter.com/alanfeuer/status/1508750495518801929 ("Federal prosecutors and congressional investigators have homed in on how a tweet by Donald Trump was a crucial call to action to far-right extremist groups that stormed the Capitol on Jan. 6"); https://twitter.com/nytmike/status/1508746178996936708 ("Fed prosecutors and congressional investigators have gathered growing evidence of how Trump's 'wild' tweet in Dec '20 served as a crucial catalyst and call to action for extremist groups, which immediately started military style planning for Jan 6."); https://twitter.com/peterbakernyt/status/1509208274595459078 ("'Be there, will be wild!'  How Trump's middle-of-the-night tweet on Dec. 19, 2020, inflamed nationalist

groups that ultimately stormed the Capitol a few weeks later")].  On March 30, 2022, a version of the 3/29 Article appeared in print in Section A, Page 1 of the New York edition of the *New York Times* with the headline: "Evidence Grows That Dec. 19 Trump Tweet Paved Way for Jan. 6".

18.     The 3/29 Article was republished millions of times by third-parties, who clearly understood the Article to convey a defamatory meaning, *see, e.g.*:

> https://twitter.com/MuellerSheWrote/status/1508901845929914368;
> https://twitter.com/kylegriffin1/status/1508866579479552002;
> https://twitter.com/stengel/status/1508778799881756674;
> https://twitter.com/NoahBookbinder/status/1508918167929765897;
> https://twitter.com/CREWcrew/status/1508813755710382090;
> https://twitter.com/Women4Biden/status/1509134960162222082;
> https://twitter.com/freedlander/status/1509185089204326404;
> https://twitter.com/RobertMaguire_/status/1508805448387997699.

19.     The 3/29 Article juxtaposes the following series of facts:

a.      "Federal prosecutors and congressional investigators are documenting how the former president's 'Be there, will be wild!' post became a catalyst for militants before the Capitol assault";

b.      "Federal prosecutors and congressional investigators have gathered growing evidence of how a tweet by President Donald J. Trump less than three weeks before Jan. 6, 2021, served as a crucial call to action for extremist groups that played a central role in storming the Capitol";

c.      "[e]xtremist groups almost immediately celebrated Mr. Trump's Twitter message, which they widely interpreted as an invitation to descend on the city in force";

d.      "[e]xtremists began to set up encrypted communications channels, acquire protective gear and, in one case, prepare heavily armed 'quick reaction forces' to be staged outside Washington";

e.     "[t]he event on Dec. 12, 2020, which Mr. Trump flew over in Marine One, showed his ability to draw huge crowds of ordinary people in support of his baseless assertions that the election had been stolen.  But it also brought together at the same time and place extremist and paramilitary groups like the Proud Boys, the Oath Keepers and the 1st Amendment Praetorian, who would be present on Jan. 6"; and

f.     "Mr. Trump's message arguably landed with the greatest impact among members of the same extremist groups that had been in Washington on Dec. 12".

20.     The defamatory gist of the 3/29 Article is that 1AP is an extremist paramilitary group that played a central role in storming the Capitol on January 6, 2021. The ordinary meaning of the words used and the context in which they were employed in the 3/29 Article makes them susceptible to a defamatory implication.

## C.    The 6/29 Article

21.     On June 29, 2022, NYT published an online article written by Feuer entitled, "*Jan. 6 Panel Explores Links Between Trump Allies and Extremist Groups*" [https://www.nytimes.com/2022/06/29/us/politics/trump-flynn-stone-jan-6-extremist.html (the "6/29 Article")].  A version of the 6/29 Article appeared in print on June 30, 2022, on Section A, Page 17 of the New York edition of the *New York Times* with the headline: "Testimony of Trump Allies And Extremists at Hearing".

22.     The 6/29 Article was republished millions of times by third-parties, who clearly understood the Article to convey a defamatory meaning, *see, e.g.*:

> https://twitter.com/CREWcrew/status/1542606257638572034;
> https://twitter.com/illinoisdems/status/1543240583992442881;
> https://twitter.com/JesseFFerguson/status/1542672880252723200;
> https://twitter.com/jordangreennc/status/1542597981484060674;
> https://twitter.com/juliarobbmar/status/1542356153597923329;
> https://twitter.com/jilevin/status/1542514757596377089.

23.     The 6/29 Article juxtaposes the following series of facts:

a.      the J6 Committee "explores links between Trump Allies [Flynn and Stone] and extremist groups";

b.      "Trump, on the eve of the Capitol attack, had tried to open a channel of communication with a pair of allies [Flynn and Stone] who had not only worked on his behalf for weeks challenging the results of the election, but who also had extensive ties to extremist groups like the Proud Boys and the Oath Keepers, who were soon to be at the forefront of the violence";

c.      in July, Jamie Raskin "said he intends to lead a presentation that will focus on the roles far-right groups like the Proud Boys, the Oath Keepers and the 1st Amendment Praetorian played in the Capitol attack";

d.      as early as Dec. 12, 2020, "the 1st Amendment Praetorian protected Mr. Flynn when he appeared as a speaker at a pro-Trump march in Washington"; and

e.      on "Jan. 6 itself … a few members of the 1st Amendment Praetorian protected Mr. Flynn again.  Around the same time … a member of the group, Philip Luelsdorff, was briefly present in the so-called war room at the Willard Hotel where pro-Trump lawyers, including Mr. Giuliani and John Eastman, had set up shop to plan the objections to the certification of the Electoral College vote count".

24.     The defamatory gist of the 6/29 Article is that 1AP is a violent extremist group that played a role in the January 6, 2021 Capitol attack.  The ordinary meaning of the words used and the context in which they were employed in the 6/29 Article makes them susceptible to a defamatory implication.

**D.**     **The NPR Statements**

25.     On June 30, 2022, NPR host Terry Gross published an article entitled, "***Did the Trump camp help far-right militia groups plan the Jan. 6 attack?***", and aired an interview with Feuer.     [https://www.npr.org/2022/06/30/1108913337/did-the-trump-camp-help-far-right-militia-groups-plan-the-jan-6-attack (the "NPR Statements")].

26.     During the NPR interview, Feuer published the NPR Statements, including:

a.     "[w]hile we don't know what Meadows may have said to Stone and Flynn, what we do know is that Stone and Flynn both have extensive contacts to far-right militia groups that were intimately involved in the attack on the Capitol";

b.     "it is without dispute that in the run up to January 6, there were two pre-January 6 big pro-Trump rallies in Washington, and one was in November, and one was in December.  And Stone and Flynn both played very active roles in speaking at those events and in pushing the big lie that there was fraud in the election and then, you know, taking part in, you know, kind of the support of Trump's overarching message that he should stay in power.  And at those events, Stone and Flynn were often accompanied by members of the Proud Boys, the Oath Keepers and a third group which we will probably hear more about soon called the 1st Amendment Praetorian, who served as both kind of personal bodyguards for them and did event security for the larger rallies";[3] and

---

[3]     "GROSS: Wow.  OK.  So if Mark Meadows at the time was Trump's chief of staff and Trump asked Meadows to contact Roger Stone and Mike Flynn the night before the insurrection, that kind of connects Trump to the planning for it?  Is that what's being suggested here?"

c.      the call from Meadows to Stone and Flynn "is a potential conduit in which Trump could be connected directly to these militia groups that, ultimately, were at the vanguard of the attack on the Capitol."

27.     Viewed as a whole, the defamatory gist of the NPR Statements is that 1AP is a far-right militia group that was intimately involved in the attack on the Capitol. The ordinary meaning of the words used by Feuer and the context in which they were employed makes them susceptible to a defamatory implication.

**E.      The 7/11 Article**

28.     On July 11, 2022, NYT published an online article written by Luke Broadwater entitled, "***Raskin Brings Expertise on Right-Wing Extremism to Jan. 6 Inquiry***" [https://www.nytimes.com/2022/07/11/us/jamie-raskin-jan-6-hearing.html (the "7/11 Article")]. A version of the 7/11 Article appeared in print on July 12, 2022, on Section A, Page 13 of the New York edition of the *New York Times* with the headline: "Raskin Faces Major Moment in 5-Year Crusade Against Extremism".

29.     The 7/11 Article was republished millions of times by third-parties, who clearly understood the Article to convey a defamatory meaning, *see, e.g.*:

> https://twitter.com/SIfill_/status/1546649044277133315;
> https://twitter.com/dancohen3000/status/1546850058649346048;
> https://twitter.com/CultExpert/status/1546834093991772162;
> https://twitter.com/mkorman/status/1546808125822537734;
> https://twitter.com/RepLloydDoggett/status/1546928567505895425.

30.     The 7/11 Article juxtaposes the following series of facts:

a.      the J6 Committee uncovered information "about the role of domestic extremists in the riot";

b.     a July hearing of the J6 Committee "promises to dig deeply into how far-right groups helped to orchestrate and carry out the Jan. 6 assault at the Capitol";

c.     "after Mr. Trump's many efforts to overturn the 2020 election had failed, he and his allies turned to violent far-right extremist groups";

d.     "[t]here were Proud Boys, Oath Keepers, Three Percenters, the QAnon network, Boogaloo Boys, militia men and other assorted extremist and religious cults that assembled under the banner of 'Stop The Steal'";

e.     "[t]his was quite a coming-out party for a lot of extremist, antigovernment groups and white nationalist groups that had never worked together before";

f.     "Donald Trump's tweet urging everyone to descend upon Washington for a wild protest on Jan. 6 succeeded in galvanizing and unifying the dangerous extremists of the country";

g.     the J6 "panel plans to detail known links between the political operative Roger Stone, a longtime ally of Mr. Trump's, the former national security adviser, Michael T. Flynn, and the extremist groups";

h.     "Mr. Flynn has ties to the 1st Amendment Praetorian paramilitary group"; and

i.     "there are few members of Congress better equipped to lead such a hearing than Mr. Raskin … who has spent many nights immersed in the cultural and ideological underpinnings of the extremist groups".

31.     The defamatory gist of the 7/11 Article is that 1AP is a domestic violence extremist group that helped to orchestrate and carry out the January 6, 2021 assault at the

Capitol.  The ordinary meaning of the words used and the context in which they were employed in the 7/11 Article makes them susceptible to a defamatory implication.

32.     The implications of the J3 Article, the 3/29 Article, the 6/29 Article, the NPR Statements and the 7/11 Article are materially false.  1AP is not a violent, dangerous, paramilitary, extremist group.  1AP played no role whatsoever in the attack on the United States Capitol on January 6, 2021 and certainly did not storm the Capitol on January 6, 2021.  Comparing the false implications to the truth, it is beyond peradventure the statements are materially false. *Flynn v. Cable News Network, Inc.*, 2022 WL 3334716, at * 5 (S.D.N.Y. 2022) ("given the extreme negative connotations of being a QAnon follower, the Flynns have adequately alleged that being labeled a QAnon follower would have a different effect on the mind of a viewer than the pleaded truth."); *Nunes v. W.P. Company*, 2021 WL 3550896, at * 4 (D. D.C. 2021) ("A reasonable juror could conclude that there is a material difference between stating that Nunes had made a claim supported by evidence (that the Obama administration had undertaken intelligence activities related to individuals involved in the Trump campaign) and stating that Nunes had made a baseless claim (that the Obama administration had wiretapped Trump Tower).  A reasonable juror could therefore conclude that the article was materially false because it stated that Nunes had made such a baseless claim (when he had not)."); *see also Bustos v. A&E Networks*, 646 F.3d 762, 767 (10th Cir. 2011) (Gorsuch, J.) ("Comparing the challenged defamatory statement (membership in the Aryan Brotherhood) to the truth (conspiring with and aiding and abetting the Aryan Brotherhood), we cannot see how any juror could find the difference to be a material

one—that is, likely to cause a reasonable member of the general public to think significantly less favorably of Mr. Bustos").

33.      The J3 Article, the 3/29 Article, the 6/29 Article, the NPR Statements and the 7/11 Article omit material facts, including that 1AP provided security detail to the press on January 6, 2021 and that Philip Luelsdorff ("Luelsdorff"), a member of 1AP, was briefly present in the so-called war room at the Willard Hotel simply to drop someone off.  He had no conversations with anyone.  He left without any substantive interaction.  [https://timesofsandiego.com/politics/2022/12/29/san-diegos-christina-bobb-heard-trump-call-to-georgians-it-was-perfectly-fine/ (Christina Bobb, who was in the room at the Willard Hotel, has "no idea" who Luelsdorff is)].

34.      The implications of the J3 Article, the 3/29 Article, the 6/29 Article, the NPR Statements and the 7/11 Article are defamatory per se. *Flynn v. Cable News Network, Inc.*, 2021 WL 5964129, at * 4 (S.D.N.Y. Dec. 16, 2021) ("[F]alsely implying a connection to a violent extremist group can be defamatory."); *see id. Zimmerman v. Buttigieg*, 521 F.Supp.3d 1197, 1214 (M.D. Fla. 2021) ("defamation *per se* is not confined to statements that someone committed a crime, as statements that tend to subject a person to hatred, distrust, ridicule, contempt or disgrace can suffice.  Certainly, a statement that attributes racist and white supremacist attributes to someone could subject that person to such harm.") (citation omitted); *Sirer v. Aksoy*, 2021 WL 4952610, at * 4 (S.D. Fla. 2021) ("in the Complaint, Plaintiff alleges that Defendant posted a video on his YouTube channel accusing Plaintiff of being a member of an organization designated as a terrorist organization … Plaintiff alleges that his reputation has been harmed by Defendant's statements, and that they pose a threat to Plaintiff's and his family's safety.

Plaintiff need not allege more.") (citation omitted); *Coker v. Barr*, 2020 WL 9812034, at * 8 (D. Colo. 2020) ("it is hard to imagine a greater stigma than being associated with terrorism in our post-9/11 world.").

35.     An accumulation of facts and evidence demonstrates that NYT and Feuer published the statements with knowledge of falsity or reckless disregard for the truth.  In assessing a defendant's subjective doubts as to the truth of the publications, a Court may look at "the defendant's own actions or statements [and] the inherent improbability of the story." *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 183 (2nd Cir. 2000). Given 1AP's stature and the fact that they were fully and thoroughly investigated and never charged with any crime related to the attack on January 6, 2021, the statements are inherently improbable.   The inherent improbability of the statements is prima facie evidence of reckless disregard for the truth. *See, e.g., St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("Professions of good faith will be unlikely to prove persuasive, for example, … when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation."); *US Dominion, Inc. v. Powell*, 554 F.Supp.3d 42, 63 (D. D.C. 2021) ("a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it."); *Stern v. Cosby*, 645 F.Supp.2d 258, 279 (S.D.N.Y. 2009) ("printing a claim that Birkhead and Stern had sex would be a way to make it to the top of the bestseller list, and a reasonable jury could find that Cosby ignored the inherently improbable nature of the Statement in her zeal to write a blockbuster book"); *Zuckerbrot v. Lande*, 75 Misc.3d 269, 167 N.Y.S.3d 313, 335-336 (N.Y.Sup. 2022) (defendant

leveled "inherently improbable" accusations, like the claim that "Zuckerbrot and her family dispatched 'people' to follow, intimidate, and potentially 'physically harm'" defendant).  In truth, the descriptions of 1AP and the implication that it played a role in the January 6 insurrection is completely fabricated.  NYT and Feuer published the false implications as part of a preconceived government narrative that "domestic violent extremists" were involved in the attack on the Capitol. *St. Amant*, 390 U.S. at 732 ("Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant [or] is the product of his imagination").  By repeatedly publishing and republishing the defamatory implication, NYT and Feuer knowingly abandoned all journalistic standards and integrity and principles of ethical journalism. *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 161 (1967) ("Where a publisher's departure from standards of press responsibility is severe enough to strip from him the constitutional protection our decision acknowledges, we think it entirely proper for the State to act not only for the protection of the individual injured but to safeguard all those similarly situated against like abuse").  NYT and Feuer did not seek the truth or report it.  Rather, they betrayed the truth in a misguided CNN-like quest to sensationalize news about the January 6 "insurrection". *Tomblin v. WCHS-TV8*, 2011 WL 1789770, at * 5 (4th Cir. 2011) (unpublished) ("on the question of whether WCHS-TV8 deliberately or recklessly conveyed a false message to sensationalize the news and thus to provide factual support for a finding of malice, there are disputed facts").  Finally, NYT and Feuer knew from their examination of a defamation lawsuit filed by 1AP in April 2022 that 1AP contended that the implications were false and defamatory.  In spite of this knowledge, NYT and Feuer brazenly republished the implications about 1AP. *Nunes v.*

*Lizza*, 12 F. 4th 890, 901 (8th Cir. 2021) ("'Republication of a statement after the defendant has been notified that the plaintiff contends that it is false and defamatory may be treated as evidence of reckless disregard.' Restatement (Second) of Torts § 580A cmt. d (Am. L. Inst. 1977)).

36.     On December 15, 2022, 1AP served Defendants with written notice advising Defendants that the implications of the Articles were false and defamatory and demanding that the Articles be retracted, and removed from the Internet.  Defendants refused to retract.

## COUNT I – <u>DEFAMATION</u>

37.     1AP restates paragraphs 1 through 36 of this Complaint, and incorporates them herein by reference.

38.     1AP is a private company.  It is not a public figure.

39.     NYT and Feuer published false statements of fact of or concerning 1AP, including in multiple tweets on March 29, 2022 and March 30, 2022 that 1AP stormed the United States Capitol on January 6, 2021.

40.     NYT and Feuer published the false statements without privilege of any kind.

41.     NYT and Feuer lacked reasonable grounds for a belief in the truth of the defamatory statements, and acted negligently in failing to determine the true facts. Defendants linked 1AP to other violent extremist groups.  Given the certain opprobrium and harm that Defendants knew would result to 1AP from being associated with the violent attack on the Capitol on January 6, 2021, Defendants were grossly negligent in publishing the false statements.  Defendants failed to exercise reasonable care, abandoned

ethical duties to report the truth and minimize harm, and, in their desire to publish a scandalous story about 1AP, violated the codes of ethics and journalistic integrity, customs and standards in the industry applicable to the media.

42.     NYT and Feuer's statements constitute express defamation published with actual malice.

43.     As a direct result of Defendants' defamation, 1AP suffered damage and loss, including, but not limited to, special damage, loss of income, lost future earnings and diminished earning capacity, injury to standing, good will and reputation, costs and other out-of-pocket expenses, in the sum of $75,000,000.00 or such greater amount as is determined by the Jury.

## COUNT II – DEFAMATION BY IMPLICATION

44.     Plaintiff restates paragraphs 1 through 43 of this Complaint, and incorporates them herein by reference.

45.     The strong defamatory gist and false implication of the J3 Article, the 3/29 Article, the 6/29 Article, the NPR Statements and the 7/11 Article is that 1AP played a role, participated in or conspired and colluded with others to plan and undertake the violent seditious attack upon the United States Capitol on January 6, 2021.  The Articles imply that 1AP engaged in conduct that is criminal, dishonest, deceitful, immoral, unethical, and that, at the very least, they knowingly aided and abetted such misconduct.

46.     NYT and Feuer carefully chose their words and purposefully misrepresented facts.  In the J3 Article, the 3/29 Article, the 6/29 Article, the NPR Statements and the 7/11 Article, NYT and Feuer juxtaposed a series of facts so as to imply a defamatory connection between them, and to create the false impression that 1AP

was one of the violent extremist groups involved in the attack on the Capitol.  NYT and Feuer linked facts to convey the false impression that 1AP and other "extremists" were connected and engaged in a coordinated effort to attack the Capitol on January 6, 2021. NYT and Feuer also intentionally omitted facts in a way that conveyed a false meaning and that rendered the challenged Articles defamatory by implication.

47.     Defendants intended and endorsed the defamatory implication by, *inter alia*, using incendiary and suggestive phrases and discussions of 1AP's involvement in criminal activity on January 6, 2021, including the violence and attack on the Capitol building.   NYT held out Feuer as a reporter that covered "extremism and political violence" since 1999, implying that Feuer was an expert and adding credibility to the defamatory implication.  The manner in which NYT and Feuer presented the discussion also demonstrates that they intended or endorsed the defamatory implication.

48.     The J3 Article, the 3/29 Article, the 6/29 Article, the NPR Statements and the 7/11 Article constitute defamation by implication.

49.     As a direct result of Defendants' defamation by implication, 1AP suffered damage and loss, including, but not limited to, special damage, loss of income, lost future earnings and diminished earning capacity, injury to standing, good will and reputation, costs and other out-of-pocket expenses, in the sum of $75,000,000.00 or such greater amount as is determined by the Jury.

Continued on Next Page

19

Plaintiff alleges the foregoing based upon personal knowledge, public statements of others, and records in its possession. Plaintiff believes that substantial additional evidentiary support, which is in the exclusive possession of NYT and Feuer and their agents and other third-parties, will exist for the allegations and claims set forth above after a reasonable opportunity for discovery.

Plaintiff reserves the right to amend this Complaint upon discovery of additional instances of the Defendants' wrongdoing.

## <u>CONCLUSION AND REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiff, 1st Amendment Praetorian, respectfully requests the Court to enter Judgment against NYT and Feuer, jointly and severally, as follows:

A.      Compensatory damages in the amount of $75,000,000.00 or such greater amount as is determined by the Jury;

B.      Punitive damages in the amount of $25,000,000.00 or the maximum amount allowed by New York;

C.      Prejudgment interest from January 6, 2021 until the date Judgment is entered at the maximum rate allowed by law;

D.      Postjudgment interest at the maximum rate allowed by law;

E.      Costs and such other relief as is just and proper.


### TRIAL BY JURY IS DEMANDED


DATED:        January 3, 2023

1ST AMENDMENT PRAETORIAN


By:   */s/ Anthony C. Carlini, Jr.*
        Anthony C. Carlini, Jr., Esquire
        (New York Bar # 2648374)
        Handel & Carlini, LLP
        1984 Hackensack Road
        Poughkeepsie, NY 12603
        Telephone:  (845) 454-2221
        Facsimile:  (845) 471-1005
        Email: anthony@handelcarlini.com

        Steven S. Biss (VSB # 32972)
        300 West Main Street, Suite 102
        Charlottesville, Virginia 22903
        Telephone:  (804) 501-8272
        Facsimile:  (202) 318-4098
        Email:  stevenbiss@earthlink.net
        (*Motion for Admission Pro Hac Vice*
            *To be Filed*)

        *Counsel for the Plaintiff*